[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 7, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-16100

_____

D. C. Docket No. 06-80943-CV-KAM

JOHN GARCZYNSKI,
the Estate of,

Plaintiff-Appellant,

versus

SHERIFF RIC L. BRADSHAW,
(PBSO) Officially,
DEPUTY ROD WITHROW,
(PBSO) Individually,
DEPUTY DANA MACLEOD,
(PBSO) Individually,
DEPUTY SHAWN GODDARD,
(PBSO) Individually,
OFFICER ROBERT ADAMS,
(BRPD), et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 7, 2009)

Before DUBINA, Chief Judge, BIRCH and WILSON, Circuit Judges.

PER CURIAM:

This case involves the use of deadly force by police officers responding to a 911 call of a suicidal, armed man named John Garczynski ("Garczynski"). The Estate of Garczynski ("the Estate") sued Sheriff Ric Bradshaw of the Palm Beach County Sheriff's Office ("PBSO") in his official capacity and several police officers in their individual capacities for violations of Garczynski's Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 (Counts I-VII), assault and battery, (Count VIII), and negligence (Count IX).[1] The district court granted summary judgment in favor of the police officers and dismissed the state law claims (Counts VIII-IX) without prejudice. After careful review of the entire record, including oral argument, we AFFIRM.

## I. BACKGROUND

The night of 9 March 2005 was cold, rainy, and windy. About 9:40 P.M., Deputy Jonathan Wildove of the PBSO received notice of a suicidal subject. Deputy Wildove drove to the residence of the subject's estranged wife, Leigh Garczynski ("Leigh"). Leigh showed Deputy Wildove several documents

---

[1]One of the named defendants, Officer Robert Adams of the Boca Raton Police Department, was voluntarily dismissed from this action.

Garczynski had given her that night. Among the papers were Garczynski's last will and testament, an obituary listing Garczynski's date of death as 9 March 2005, a journal containing numerous references to Garczynski's intent to kill himself on that same date, a letter to Leigh expressing his love for her, and a recent e-mail in which Garczynski advised Leigh that the divorce papers were ready and in which he apologized for "everything in the past, present, and future." R2-84, Exh. 54 at 10-11.

Garczynski had handed Leigh the documents in a large envelope earlier that evening after a bowling league outing, instructing her not to open it "until something happens." R2-84, Exh. 53 at 32 ("Leigh Deposition"). He had then driven off in his Ford Explorer sport utility vehicle. Despite having separated several months earlier, Leigh and Garczynski remained friendly and regularly bowled together. That night, however, Leigh had returned Garczynski's wedding band to him at his request. She had expected the packet to contain divorce papers and opened the envelope immediately. Concerned by its contents, Leigh called Garczynski on his cell phone. Both began crying. Garczynski refused to disclose his whereabouts or meet with Leigh. He said he had a gun and planned to kill himself. Leigh believed Garczynski was serious. Leigh also initially feared for her own safety based on a statement in Garczynski's will contemplating what should

3

happen if she died before her husband did. Upon returning to her parents' house where she was living, Leigh called 911 for help with suicide prevention.

Sergeant Robert Sandt and Deputy Dana MacLeod of the PBSO also responded to the dispatch call and met with Deputy Wildove at Leigh's residence. Leigh told the officers that Garczynski had never been violent and had served in the Navy doing administrative work. After reviewing the documents that Garczynski had provided to Leigh, Sergeant Sandt concluded that Garczynski intended to kill himself. Since his location was unknown and he was armed, the officers' first priority was to find him. Sergeant Sandt sent police to Garczynski's residence in West Palm Beach and Deputy Wildove notified Garczynski's best friend. As a safety precaution, Deputy Shawn Goddard of the PBSO and another officer patrolled Leigh's neighborhood.

Sometime after Deputy Wildove's arrival, Garczynski called Leigh on her cell phone. Leigh moved to the front porch where she remained on the phone with Garczynski for several hours. Sergeant Sandt instructed Deputy Wildove to monitor the conversation and ferret out Garczynski's whereabouts. Sergeant Sandt also made clear that Garczynski should not know the police were involved. At that point, Leigh's phone conversation was the officers' sole avenue for locating Garczynski and Sergeant Sandt did not want to risk losing contact with him. For

4

the same reason, Sergeant Sandt planned to call in a crisis intervention specialist after Garczynski had been found and the scene was secure.

In the beginning of the conversation, Garczynski told Leigh he had a constant stomachache and was upset about their relationship. They eventually moved on to discussions about bowling, cooking, Garczynski's two children from a previous marriage, and "working on getting back together." Leigh Deposition at 95. The tone of the conversation became calm. Although Deputy Wildove was aware of the conversation's topics and tone, he did not convey this information to Sergeant Sandt, who was coordinating the search effort from inside Leigh's house. Deputy Wildove considered these factors secondary to ascertaining Garczynski's location. Nor did Sergeant Sandt expect Deputy Wildove to relate to him the topics or tone of the conversation. Based on his fourteen years of experience in handling hundreds of suicide attempts, Sergeant Sandt believed that communication of every demeanor or mood change was impractical.

Leigh asked Garczynski several times where he was but Garczynski at first refused to say. She guessed he was somewhere outside judging from the background sounds of wind and rain. Towards the middle of the conversation, Garczynski said he was at the beach and that she would know which one. Leigh assumed that he was referring to the beach near Spanish River Boulevard where

they had spent their second date.

Meanwhile, the cell phone company had been attempting to triangulate Garczynski's position. Using that information, Deputy Goddard searched the Spanish River Boulevard for Garczynski. Deputy Rob-Roy Withrow of the PBSO, who was familiar with the area, voluntarily assisted in the search. At one point, they spotted a man talking on a cell phone while walking along the boulevard. They did not approach him, however. Shortly thereafter, Deputy Withrow discovered Garczynski's vehicle parked in a lot at the Boca House apartment complex on Spanish River Boulevard. The vehicle had been backed into a hedge with the front facing the parking lot. The lot's single lamp provided little illumination. The poor weather conditions also made it difficult to see inside the car. The windows were fogged and tinted in back and on the side. Although Deputy Withrow came very close to the vehicle, he was unable to tell if anyone was inside.

Sergeant Sandt implemented several precautionary measures to contain the environment and provide optimal safety for everyone involved. The Boca Raton Police Department set up a perimeter around the area; fire department paramedics staged at a nearby drugstore; officers deployed stop sticks, designed to deflate a car's tires, at the parking lot's single exit; and a ballistic shield was ordered. The

Broward Sheriff's Office and the PBSO attempted to provide helicopters but the wind and rain prevented take-off. Officer Robert Adams from the Boca Raton Police Department also arrived with his dog to assist in the search for Garczynski.

By 1:00 A.M., five officers were at the Boca House parking lot where Garczynski's car was located: Lieutenant Jay Hart from the PBSO, Deputy Withrow, Deputy Goddard, Deputy MacLeod, and Officer Adams. Sergeant Sandt, who was still at Leigh's house, had relinquished tactical command to Lieutenant Hart upon his arrival at Boca House but the two conferred as to the best course of action. Sergeant Sandt suggested that four officers make a "dynamic approach" using a ballistic shield to determine whether Garczynski was in his car. R2-84, Exh. 13 at 32-33 ("Hart Deposition"). In Sergeant Sandt's experience, this strategy effectively alleviates violence by overwhelming the situation before an individual can calculate a counter plan.

While this approach was being formulated, Deputy Wildove told Leigh to talk Garczynski into returning to his car. Consequently, Leigh suggested to Garczynski that he warm himself up by getting in his car. Based on information from Deputy Wildove, Sergeant Sandt informed the officers at the Boca House at 1:08 A.M. that Garczynski was walking to his car. Leigh heard the sound over the phone of the seatbelt reminder after Garczynski entered his car. At 1:09 A.M.,

7

Deputy MacLeod saw the dome light turn on and reported that Garczynski was in the vehicle. Deputy Wildove then directed Leigh to have Garczynski start the engine.[2] None of the officers at Boca House knew that Garczynski had been instructed to go to his vehicle or start the engine.

After Garczynski's vehicle started, Lieutenant Hart advised the officers at 1:10 A.M., "Do not let him leave, guys." Hart Deposition at 42. Lieutenant Hart knew stop sticks had been deployed but believed Garczynski could have avoided them by driving around the exit. Even if Garczynski's tires had been deflated by the stop sticks, his car was still capable of being driven for some distance. In any event, Lieutenant Hart did not want to risk a "running gun battle" with an armed man who was potentially suicidal. Hart Deposition at 31.

Over the phone, Leigh thought she heard a voice shout, "Police!" Leigh Deposition at 69. Garczynski said in a surprised voice, "Oh you called the – You called the cops on me?" Id. at 68-69. Leigh also heard John say, "No, never." Id. at 70. At that point, Leigh handed her phone to Deputy Wildove. Deputy Wildove heard Garczynski say in a "mad" tone, "Don't come in here, don't come in here." R2-84, Exh. 37 at 49, 59-60 ("Wildove Deposition"). Deputy Wildove then heard

---

[2] We note that Deputy Wildove denied instructing Leigh to tell Garczynski to go to his car or to start the engine. As did the district court, we credit Leigh's testimony on these factual disputes.

8

police officers shouting commands, some banging noises, and finally gunfire. Id. at 49.

The four officers who approached the vehicle testified as follows about the sequence of events. Upon hearing the engine start and Lieutenant Hart's command not to let the vehicle leave, the officers abandoned their plan to wait for the ballistic shield. Deputy MacLeod and Officer Adams approached the front of the vehicle. The front windshield wipers came on. Both officers saw Garczynski holding a cell phone to his face with his left hand. They identified themselves as police officers and shouted repeatedly, "Show me your hands, show me your hands, put the phone down, show me your hands." R2-84, Exh. 21 at 42 ("MacLeod Deposition"). Garczynski did not comply, keeping his right hand hidden and leaning forwards.

Meanwhile, Deputy Withrow and Deputy Goddard had approached Garczynski's vehicle from the rear. Deputy Withrow could not see inside the car because the windows were fogged. He was unable to open the passenger door. Deputy Withrow then used his flashlight to smash out the front passenger window. It took several hits before he succeeded. The other officers continued to shout commands to Garczynski to show his hands and get out of the vehicle. Within seconds, Deputy Withrow also shattered the back passenger window.

At some point, Officer Adams, Deputy MacLeod, and Deputy Goddard saw Garczynski raise a gun in his right hand to his temple. Deputy MacLeod shouted, "Gun, gun, gun." R2-84, Exh. 5 at 45 ("Goddard Deposition"). The officers repeatedly ordered Garczynski to drop his gun. Upon breaking the second window, Deputy Withrow pointed his gun at the vehicle and shouted, "Put the gun down. Put the gun down." R2-84, Exh. 45 at 59 ("Withrow Deposition"). According to Officer Adams, Garczynski then "took the weapon from his head and pointed it at Deputy Withrow." R2-84, Exh. 2 at 40 ("Adams Deposition"). Officer Adams explained that "in the process of pointing it at Officer Withrow he also pointed it at myself and Deputy MacLeod." Id. at 57. Officer Adams then shot at Garczynski. Deputy MacLeod simultaneously saw the gun move from Garczynski's head and "come across and come out the window." MacLeod Deposition at 47. Deputy MacLeod heard Officer Adams fire his gun and began shooting as well.

Deputy Withrow testified that after breaking the second window, he saw Garczynski holding a cell phone in his left hand and pointing a gun at his head with his right hand. Deputy Withrow ordered Garczynski to "Put the gun down, put the gun down." Withrow Deposition at 59. Instead, Garczynski turned and looked at him. Garczynski "then extended his arm straight in front of him and out

10

and around and did it in a swinging motion and pointed it at me." Id. Deputy

Withrow recalled the following:

> [M]y thought process at the time was as he was swinging his weapon around, that he was shooting at the officers to my right. That's when I began to shoot. As muzzle flashes were going off, I was shooting. And what I recall, and what I remember, which was explicit in my mind at the time, was that he didn't stop; he kept coming, he kept swinging around on me as the muzzle shots were going off and as I was firing.

Id. at 66. Deputy Withrow shot at Garczynski in order to "stop the threat towards the other officers and myself." Id. at 70. As he fired, Deputy Withrow stepped back and bumped into a protruding tire of another car, whereupon he fell to the ground.

Deputy Goddard, who was standing behind Deputy Withrow when the shooting began, thought Deputy Withrow had been shot when he fell down. Specifically, Deputy Goddard testified as follows:

> The best of my recollection was Mr. Garczynski brought the gun from his temple, swung around to the position of the deputies in front and the gun come around to my position. Shots were being fired. Deputy Withrow was still here. I couldn't take any action because I had Deputy Withrow in my line of fire. I was merely cover; I couldn't do anything. After the shots were fired, Deputy Withrow fell back. I believed him to be shot. The gun was still in my direction. I believed I was going to be shot next.

Goddard Deposition at 48. Deputy Goddard "fired to stop him from shooting me."

Id. at 50. The shooting was over within seconds. Deputy MacLeod called the

11

paramedics at 1:12 A.M.

Less than two minutes elapsed between the time Garczynski started his engine and the time he was fatally wounded by the officers. The officers fired thirty bullets, ten of which hit Garczynski. Garczynski's gun, a nine-millimeter semi-automatic pistol, lay on the front passenger seat. The gun was in working order and loaded with one round in the firing chamber and two rounds in the magazine. The gun had not been fired, and neither the hammer nor slide of the gun appeared to have been locked back.

The PBSO has officers specifically trained in handling suicidal individuals. At the time of the incident, Sergeant Sandt, Deputy Wildove and Officer Adams had been trained in suicide prevention. Lieutenant Hart had received some instruction at the police academy pertaining to suicide attempts. Deputies MacLeod and Withrow also had training at the academy dealing with mentally distressed individuals. In particular, Deputy Withrow had extensive experience with suicide attempts and received a number of commendations for his handling of them. All of the aforementioned law enforcement agents were seasoned police officers, ranging in experience from seven to twenty years.

The Estate brought a civil suit seeking monetary damages in excess of ten million dollars. The district court granted summary judgment as to the Estate's

§ 1983 claims of excessive and deadly force on grounds that the officers were entitled to qualified immunity. The court first concluded that Sergeant Sandt and Deputy Wildove did not violate Garczynski's constitutional rights by failing to convey to the Boca House officers that Garczynski was calm and started his car at his wife's instruction. Additionally, the court determined that the style and timing of the dynamic approach by Deputies Withrow, MacLeod, and Goddard did not violate Garczynski's constitutional rights. Next, the district court concluded that the officers' use of deadly force was objectively reasonable under the circumstances because "the officers faced an imminent threat of danger when Garczynski failed to drop the gun as he was commanded to do and pointed it at them." R4-152 at 21. The district court found no competent evidence to raise a genuine issue of material fact regarding the officers' version of events immediately preceding the shooting. Because Garczynski's constitutional rights were not violated, the district court held that the Estate's § 1983 claims of deliberate indifference against Sheriff Bradshaw, acting in his official capacity, necessarily failed. Finally, the district court dismissed without prejudice the Estate's remaining state law claims of assault, battery, and negligence so that the Estate could pursue them in state court if it chose.

The Estate now appeals the grant of summary judgment as to its § 1983

claims of excessive force and deliberate indifference.

## II. DISCUSSION

We review de novo the district court's grant of summary judgment. Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009). At the summary judgment stage, we must determine the relevant set of facts and draw all inferences in favor of the opposing party "*to the extent supportable by the record.*" Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8 (2007). The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. Id. at 380, 127 S. Ct. at 1777 (quoting Federal Rule Civil Procedure 56(c)). A genuine dispute requires more than "some metaphysical doubt as to the material facts." Id. at 380, 127 S. Ct. at 1776 (quotation marks and citation omitted). A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment. Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004). Furthermore, summary judgment is appropriate even if "*some* alleged factual dispute" between the parties remains, so long as there is "no *genuine* issue of *material* fact." Scott, 550 U.S. at 380, 127 S. Ct. at 1776 (quotation marks and citation omitted).

Section 1983 enables a citizen to sue any person acting under color of state

law who violates his or her federal constitutional rights.  See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120, 112 S. Ct. 1061, 1066 (1992).  The threat of litigation may stymie a police officer's ability to perform his duties effectively, however.  To address this concern, qualified immunity protects a police officer from liability under § 1983 if he was acting within his discretionary authority and his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Lewis, 561 F.3d at 1291 (quotation marks and citation omitted).

There is no dispute that the officers acted in a discretionary capacity when they attempted to secure Garczynski, who was an armed and potentially suicidal individual.  See Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005).  The burden then shifted to the Estate to show that qualified immunity should not apply because: (1) the officers violated a constitutional right, and (2) that right was clearly established at the time of the incident.  See id.  The order in which we address these two issues depends on the particular circumstances of each case.  See Pearson v. Callahan, 555 U.S. ___, 129 S. Ct. 808, 818 (2009).  We will follow the traditional approach here by first analyzing whether the officers violated Garczynski's constitutional rights.  Because we conclude that no constitutional violation occurred, we need not reach the second prong.  See Case v. Eslinger, 555

15

F.3d 1317, 1328 (11th Cir. 2009).

A. Excessive and Deadly Force

The Estate claims that the officers used excessive and deadly force in violation of Garczynski's Fourth Amendment right to be free from an unreasonable seizure. Any claim that a law enforcement officer used excessive force – whether deadly or not – during a seizure of a free citizen must be analyzed under the Fourth Amendment's "reasonableness" standard. Graham v. M.S. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) (quotation marks omitted). This standard requires balancing the nature of the Fourth Amendment violation against the government's interests. See id. at 396, 109 S. Ct. at 1871. The government's interests include protecting the safety of the police officers involved as well as the public at large. See Mercado, 407 F.3d at 1157; Kesinger, 381 F.3d at 1249-50 (finding no constitutional violation where a police officer fatally shot a suicidal man who posed an immediate threat of harm to the officer and other motorists on a busy highway); see also McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003) (per curiam) (explaining that the Constitution permits deadly force "against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others").

16

The Supreme Court has emphasized that there is no precise test or "magical on/off switch" to determine when an officer is justified in using excessive or deadly force. Scott, 550 U.S. at 382, 127 S. Ct. at 1777; see also Graham, 490 U.S. at 396, 109 S. Ct. at 1872. Nor must every situation satisfy certain preconditions before deadly force can be used. See Scott, 550 U.S. at 382, 127 S. Ct. at 1777. Rather, the particular facts of each case must be analyzed to determine whether the force used was justified under the totality of the circumstances. See Graham, 490 U.S. at 396, 109 S. Ct. at 187. "[I]n the end we must still slosh our way through the factbound morass of 'reasonableness.'" Scott, 550 U.S. at 383, 127 S. Ct. at 1778.

The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded. See Graham, 490 U.S. at 396, 109 S. Ct. at 1872. Accordingly, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397, 109 S. Ct. at 1872. Those facts and circumstances are often "tense, uncertain and rapidly evolving," thereby requiring "split-second judgments" as to how much force is necessary. Id. Because an officer's perspective in the field differs from that of a judge sitting

17

peacefully in chambers, we must resist the temptation to judge an officer's actions "with the 20/20 vision of hindsight." Id. at 396, 109 S. Ct. at 1872.

Furthermore, an officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim. See Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). Regardless of whether probable cause actually existed, an officer is entitled to immunity if he "reasonably could have believed that probable cause existed, in light of the information the officer possessed." Id. Qualified immunity thereby protects officers who "reasonably but mistakenly conclude that probable cause is present." Id. (quotation marks and citation omitted). "Thus, the qualified immunity standard is broad enough to cover some mistaken judgment, and it shields from liability all but the plainly incompetent or those who knowingly violate the law." Id. (quotation marks and citation omitted).

The Estate's central argument is that the officers had no reasonable objective basis for their dynamic approach and use of deadly force. The Estate emphasizes that Garczynski had no criminal record, was not breaking any laws, had never been violent, and had been calmly discussing reconciliation with his estranged wife at the time the officers confronted him. The Estate suggests that the officers should have allowed that conversation to continue as long as possible to defuse

18

Garczynski's suicidal emotions. Additionally, the police could have waited for the ballistic shield or relied on the stop sticks. Instead, the officers rushed in with their guns drawn, shouted commands, and bashed in windows. There was no probable cause for this dynamic approach, according to the Estate, and the use of force was therefore excessive.

Our task is not to evaluate what the officers could or should have done in hindsight. The sole inquiry is whether the officer's actions, as taken, were objectively reasonable under all the circumstances. In this case, they were. The situation facing the officers the night of 9 March 2005 was urgent and inherently dangerous: a man armed with a gun had written his own obituary for that very day and no one knew where to find him. The officers had only a few hours left before that day ended. After several hours of futile searching, the officers finally located his car but could not verify that he was inside. In the midst of planning their approach, the car engine started. The officers at the Boca House thought Garczynski was about to leave. Even if these officers mistakenly believed that Garczynski was about to drive away, it was reasonable for them to attempt to contain the situation in light of the information they possessed. The officers were not required to wait and see if Garczynski remained stationary, or rely on the stop sticks and surrounding police officers to deter him should he suddenly become

19

mobile. "We think the police need not have taken that chance and hoped for the best." Scott, 550 U.S. at 385, 127 S. Ct. at 1778 (rejecting argument that the police should have taken alternative measures to protect the public and prevent injuries to the individual they were trying to apprehend). Given that Garczynski had a gun and was not clearly visible, the officers acted reasonably in immediately approaching the vehicle with their weapons drawn and shattering the vehicle's side windows to obtain a better view of him.

Furthermore, the escalation into deadly force was justified by Garczynski's refusal to comply with the officers' commands. After identifying themselves, the officers repeatedly ordered Garczynski to show his hands. They also repeatedly commanded him to drop the phone and then, after he raised a gun to his head, to drop his gun. Instead of obeying these commands, Garczynski swung the gun from his head in the direction of the officers, at which point they fired. The officers reasonably reacted to what they perceived as an immediate threat of serious harm to themselves. This is exactly the type of "tense, uncertain and rapidly evolving" crisis envisioned by the Supreme Court. Graham, 490 U.S. at 397, 109 S. Ct. at 1872. Judged from the perspective of a reasonable officer on the scene, the officers' use of deadly force was objectively reasonable under the circumstances.

The Estate asserts that several issues of material fact exist for a jury to

20

resolve. Chief among these alleged factual disputes is whether Garczynski actually brandished a gun. The Estate points out that Lieutenant Hart never saw a firearm. On the other hand, Deputy MacLeod testified that he saw a gun come across and out the window. The latter would have been physically impossible, argues the Estate, since Garczynski was sitting in the driver's seat when he allegedly aimed his gun at the rear passenger window where Deputy Withrow stood. Finally, the Estate contends that if Garczynski had indeed pointed his gun at the rear passenger window, then it would be reasonable to infer that the gun would have dropped in the rear passenger seat. Instead, the gun was found in the front passenger seat.

These arguments do not raise a genuine issue of material fact. Lieutenant Hart did not approach the vehicle with the other officers and remained thirty-five to forty feet away from Garczynski's car. He testified that he had a clear view only of the vehicle, not a clear view of anything or anyone inside the vehicle. Due to the weather, the windows were fogged, which obscured Lieutenant Hart's ability to see Garczynski. In contrast, all four of the officers standing near the vehicle testified they saw Garczynski holding a gun, pointed first to his head and then towards the officers. Whether the gun actually came out the window or merely appeared to come out the window from Deputy MacLeod's perspective does not negate his testimony (or that of the other three officers) that Garczynski pointed his

21

gun in the officers' direction. Accordingly, any discrepancies between the officers' testimony do not create a genuine issue of material fact. See Kesinger, 381 F.3d at 1249-50 (concluding that summary judgment was appropriate despite conflicting accounts of a fatal shooting because an eyewitness's version did not differ from the officer's in any material way).

That the gun was found in the front passenger seat likewise does not create a genuine factual issue as to whether Garczynski pointed his gun at the officers. The Estate argues that Deputy Withrow's testimony that Garczynski swung the gun around to his position at the rear passenger window is inconsistent with the gun landing in the front passenger seat. However, there was no expert testimony or other evidence in the record to establish how a person holding a gun would react after being shot – e.g., whether that person would tighten his grip on the weapon, fling the weapon, or drop it immediately. According to Officer Adams, Garczynski had leaned his hand with the gun against the passenger seat, which was in a slightly reclined position, when he pointed his gun at Deputy Withrow. Even after shots had been fired and Deputy Withrow had fallen down, Officer Adams saw Garczynski's hand remain in the same position with his gun up in the air. These statements are consistent with Garczynski's gun falling into either the front passenger seat or the rear passenger section. Consequently, the gun's final resting

22

place is not probative of whether or not Garczynski aimed his gun at the officers.

Even if we assumed that Garczynski did not point his gun in the officers' direction, the fact that Garczynski did not comply with the officers' repeated commands to drop his gun justified the use of deadly force under these particular circumstances. See Montoute, 114 F.3d at 185. In Montoute, a man fired an illegal weapon (a sawed-off shotgun) while in a crowd of people in a near-riot situation. Id. He ran past an officer, who repeatedly ordered him to drop the gun, and never turned to face the officer again or pointed his gun at anyone. Id. at 183. Nevertheless, we recognized that "there was nothing to prevent him from doing either, or both, in a split second. At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force." Id. at 185; see also Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) ("Even if we accept that the threat posed by Long to Deputy Slaton was not immediate in that the cruiser was not moving toward Slaton when shots were fired, the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."). Accordingly, we concluded that the officer was justified in shooting the fleeing suspect because the officer could reasonably believe that the man posed a risk of serious physical

23

injury to the officer and others.  See Montoute, 114 F.3d at 185.

In contrast to Montoute, Garczynski had not yet fired his gun and was not attempting to escape.  As in Montoute, however, the officers did not have control over Garczynski and there was nothing to prevent him from shooting at the officers in an instant.[3]  The officers could reasonably believe that the weapon was loaded, as it actually was, given Garczynski's expressed intent to commit suicide.  As in Montoute, Garczynski repeatedly disobeyed the officers' orders, first to show his hands and then to drop his gun.  These factors, even assuming that Garczynski never pointed the gun at the officers, provided a sufficient basis for the officers reasonably to believe that Garczynski posed an immediate risk of serious harm to them.

The Estate raises several other alleged factual disputes, none of which preclude summary judgment.  First, the Estate asserts that Deputy Withrow made conflicting statements as to whether Garczynski knew the police were involved before their approach.  The district court implicitly resolved any such conflict in favor of the Estate, however, when it found that Garczynski responded in a surprised voice, "Oh, you called the – you called the cops on me?"  R4-152 at 7.

---

[3] The fact that Garczynski was armed with a gun, rather than a knife, distinguishes this case from Mercado, where we concluded that a suicidal man holding a knife in his hands was not an immediate threat to officers at the time he was intentionally shot in the head with a Sage Launcher from a distance of about six feet.  See Mercado, 407 F.3d at 1155, 1157-58.

24

In any event, Garczynski's initial ignorance of police involvement does not eradicate the threat he posed by his refusal to drop the gun.

Next, the Estate maintains there is a factual dispute as to whether the officers would have approached Garczynski's car with their guns drawn had they known that he was instructed to turn on the vehicle and that he had been calmly exploring reconciliation with Leigh. The district court again viewed the evidence in the Estate's favor. Specifically, the district court found that if the officers on the scene had known that Garczynski was instructed to start his vehicle, they probably would not have approached Garczynski at that time. Id. at 13. Similarly, the district court found that Leigh and Garczynski discussed the "possibility of reconciliation," and that if the officers had known Garczynski was speaking calmly with his wife, "that fact might have given a reason to delay the approach or deal differently with Garczynski." Id. at 4, 13. Even with these facts construed in the Estate's favor, the district court correctly concluded that the timing and style of the officers' approach did not violate Garczynski's constitutional rights.

One final alleged factual dispute is whether Garczynski said anything to the police officers after they approached. Whereas Deputy MacLeod never heard Garczynski speak, the Estate points out that Deputy Wildove heard Garczynski shout, "Don't come in here, don't come in here." Wildove Deposition at 49.

25

According to the Estate, Garczynski's statement indicates he was not threatening the officers with violence. No genuine factual dispute exists, however, because the district court credited Deputy Wildove's testimony that Garczynski said, "Don't come in here." R4-152 at 7. Moreover, it is Garczynski's actions after he made this statement which caused the officers reasonably to believe that he was a serious risk of harm to them.

The outcome of this situation was undeniably a tragedy. In their efforts to prevent a suicide, the officers took a life. Yet the record reveals that their use of force was objectively reasonable considering all the circumstances from a reasonable officer's viewpoint. No constitutional violation occurred. Without this element, we need not assess whether the alleged violation was clearly established. See Case, 555 F.3d at 1328. Accordingly, the district court correctly afforded the officers qualified immunity and granted them summary judgment as to the § 1983 claims of excessive and deadly force.

B. Deliberate Indifference

The Estate next asserts a claim against Sheriff Bradshaw, acting in his official capacity, for deliberate indifference. According to the Estate, the PBSO's failure to implement a crisis intervention training program deprived Garczynski of his Fourth Amendment rights.

26

"[I]f a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation." Collins, 503 U.S. at 123, 112 S. Ct. at 1068. Section 1983 liability only attaches where "the failure to train amounted to 'deliberate indifference' to the rights of persons with whom the police come into contact." Id. at 123-24, 112 S. Ct. at 1068. Analysis of a state entity's custom or policy is unnecessary, however, when no constitutional violation has occurred. See Case, 555 F.3d at 1328 (declining to review the sheriff's and city's customs and policies in the absence of a constitutional deprivation by the individual police officer); see also Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996) ("Since we have determined that Deputy Watson's conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom relating to patrol vehicle operation and training.").

Garczynski failed to show that any of the named individual police officers deprived him of his constitutional rights by using excessive or deadly force. Absent a constitutional violation, we need not explore whether PBSO's policies regarding crisis intervention training violated Garczynski's constitutional rights. See Case, 555 F.3d at 1328; Rooney, 101 F.3d at 1381. Accordingly, we affirm summary judgment in favor of Sheriff Bradshaw.

27

## III. CONCLUSION

The officers' use of force in dealing with an armed and potentially suicidal individual was objectively reasonable in this case. Finding no constitutional violation, we agree with the district court that the individual officers were entitled to qualified immunity and summary judgment as to the Estate's § 1983 claims of excessive and deadly force. The district court also correctly granted summary judgment to Sheriff Bradshaw, acting in his official capacity, on the Estate's § 1983 claims of excessive force and deliberate indifference. We therefore AFFIRM the judgment of the district court.

AFFIRMED.