[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10108
Non-Argument Calendar

_____

D.C. Docket No. 8:15-cv-02272-CEH-JSS

MARK J. LANDON,

Plaintiff - Appellant,

versus

CITY OF NORTH PORT,

Defendant - Appellee,

KEVIN VESPIA,
in his Official Capacity as Chief of Police of North Port Police, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 10, 2018)

Before MARTIN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

On the night of July 20, 2014, City of North Port (the "City") police officers Keith Bush and Dino Murges used a police dog to track Mark Landon into a wooded area behind the home Landon shared with his mother. Landon had attempted suicide by cutting himself and was last seen bleeding, intoxicated, and carrying a knife. The officers found Landon on the ground and partially concealed in brush, and they eventually removed him from the area to be airlifted for medical treatment. During this encounter, the police dog, at Bush's command, bit Landon once in his side after he failed to comply with repeated requests to show his hands. Landon asserts that the dog bite was unreasonable and excessive in violation of his Fourth Amendment rights and that the City is liable for the constitutional violation under 42 U.S.C. § 1983. The district court granted summary judgment to the City. We now affirm.

## I.[1]

In the early evening of July 20, 2014, Landon's mother, Rose Landon ("Mrs. Landon"), walked in to her screened garage to find her son, Mark Landon, holding a knife and dripping blood from deep cuts to his wrist. Landon was depressed and had cut himself, intending to commit suicide. Mrs. Landon began screaming.

---

[1] The background facts are taken primarily from the parties' "Stipulation of Agreed Material Facts." The facts surrounding the dog bite come from the depositions of Officers Bush and Murges, who were the only witnesses to these events.

2

Next door, Peter Madish, Landon's brother-in-law, heard the screams and rushed over. Landon appeared to be under the influence of alcohol or drugs, or both, and was wearing only boxer shorts. After attempting to reason with Landon, Madish entered the garage and tried to wrest the knife away. Madish eventually secured the knife, but Landon grabbed another knife from the garage and then fled to the wooded area behind the houses. The last thing Landon remembers about these events is falling near this wooded area. He does not remember the subsequent encounter with police, which is what this case is about.

Meanwhile, while Madish struggled with Landon, Mrs. Landon went inside and called 911 to report the attempted suicide, and officers were dispatched to the home. Officer Dino Murges arrived at approximately 8:38 p.m., and Officer Keith Bush, a K-9 officer, showed up soon after with his police dog, Tomy, a Belgian Malinois. The sky was beginning to darken when Bush arrived.

At the scene, the officers spoke with both Madish and Mrs. Landon. Madish stated that Landon was intoxicated and bleeding badly, had cut himself with a knife, had fought with Madish over the knife, and then had grabbed another knife before fleeing behind the two houses. Mrs. Landon disclosed similar facts. Seeing blood at the scene, Bush decided to initiate a track using Tomy. Tomy, who was on a leash, led the officers into the wooded area, where they found Landon.

3

What follows is a description of the encounter from the perspective of Officers Bush and Murges, since Landon has no memory of it.  The officers saw Landon from approximately fifteen feet away.  He was lying in the brush, partially covered.  Both officers immediately stopped, and Murges drew his service firearm. Because Bush could not see Landon's hands since they were covered by the brush, Bush instructed Landon to show his hands.  Bush also made multiple announcements that he had a police dog.  Landon, according to the officers, rolled over onto his side and concealed his hands.  It was dark at this time, according to Murges, which made it harder to see into the brush.  Bush warned Landon that he would release the dog if Landon did not show his hands.  Apart from rolling, Landon made no other movement.  He made some sounds but nothing coherent.

Less than a minute after demanding to see Landon's hands, and after Landon rolled and further concealed his hands, Bush gave Tomy the command to bite Landon.  Tomy bit Landon once in his abdominal area, creating two puncture wounds, and pulled him onto his back.  At that point, Bush could see Landon's hands and that he was not armed, and he immediately gave Tomy the command to release.  Tomy came back to Bush.  Around this time, three backup officers arrived to provide cover and help secure the scene, and Murges moved forward, grabbed Landon's legs, and pulled him to a more open area.  The parties stipulated that the backup officers "did not witness the apprehension or the bite."

4

Landon was searched for weapons, placed on a gurney, and then removed from the woods to be transported by helicopter for emergency treatment. Landon's first memory after losing consciousness is of receiving medical treatment in the helicopter. The dog-bite wounds became infected and required extensive surgery, and Landon continues to suffer from severe pain and loss of mobility. No knife was recovered from the wooded area where Landon was found.

## II.

In an amended complaint, Landon asserted two counts against the City under 42 U.S.C. § 1983: (1) failure to train and/or supervise in violation of the Fourth and Fourteenth Amendments; (2) failure to discipline in violation of the Fourth and Fourteenth Amendments.[2] The City moved for summary judgment.

In opposition to the City's motion, Landon submitted a personal affidavit that included statements about his encounter with the officers in the woods. Among other statements, Landon averred that he did not "attempt to conceal [himself] in the vegetation," he "did not attempt to roll over on [his] side as indicated by Officer Keith Bush," and at no time "did [he] intentionally conceal

---

[2] The amended complaint also contains a Florida battery claim against the City. The district court declined to exercise supplemental jurisdiction over this claim after granting summary judgment to the City on the § 1983 claims. Landon has abandoned any argument on this claim by failing to raise the issue on appeal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014) (issues not raised on appeal are abandoned).

5

[himself], resist law enforcement, or threaten anyone either verbally or physically." He said his movements were not intentional because he was unconscious.

Landon also proffered multiple experts, including Kyle Heyen and Walt Zalisko. Heyen and Zalisko both prepared expert reports in which they determined that excessive and unreasonable force was used on Landon.

The district court granted summary judgment to the City. The court first chose to disregard Landon's affidavit as a "sham." The affidavit, according to the court, directly contradicted his deposition testimony that he was unconscious during the police encounter and could not remember any details about what either he or the officers did. Plus, because he was unconscious during the encounter, the court stated, he lacked personal knowledge of his mental state at that time.

Next, the district court determined that Landon's § 1983 claims against the City failed because he had not established a violation of a constitutional right. The court found that, while the amount of force used was "severe enough to require hospitalization," the officers reasonably could have concluded that Landon "posed a threat of serious physical harm to himself and Officers Bush and Munges at the moment Tomy bit him." At that time, the court explained, Bush knew of Landon's suicide attempt, self-inflicted bleeding wound, physical altercation with a family member, flight to a wooded area, possession of a knife, and failure to show his hands when repeatedly commanded to do so. Based on the totality of the

circumstances known to the officers, the court reasoned, Bush's decision to deploy the police dog Tomy to bite Landon was reasonable.  Finding no violation of a constitutional right, the district court did not address whether the City's custom or policy caused the alleged constitutional violation.  Landon now appeals.

## III.

Landon first argues that the district court abused its discretion by disregarding his affidavit as a sham that was inconsistent with his deposition testimony and not based on personal knowledge.  We review a district court's evidentiary rulings for an abuse of discretion.  *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007).

The district court did not abuse its discretion by excluding Landon's affidavit.  Landon concedes he lost consciousness before the officers found him and did not regain consciousness until after the dog bite.  He therefore lacks personal knowledge of, and is incompetent to testify about, any movements he may have made, voluntary or otherwise, while unconscious.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  The court properly disregarded any of Landon's statements purporting to explain what he was doing while unconscious.

7

In any event, Landon's attempts to explain the non-volitional nature of his movements are not material because "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) ("The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded."). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. As part of that inquiry, we must of course consider whether the officers should have known that Landon was unconscious based on the objective facts confronting them. But those objective facts do not include Landon's internal mental state.

## IV.

Landon next challenges the district court's grant of summary judgment to the City. We review a district court's grant of summary judgment *de novo*, viewing the facts and drawing all reasonable inferences in favor of the opposing party.[3] *Garczynski*, 573 F.3d at 1165. Summary judgment is appropriate when

---

[3] We need not address Landon's arguments that the district court failed to view the facts in the light most favorable to him because, "on *de novo* review of a summary judgment ruling, we may not only affirm on any ground supported by the record, but may also choose to disregard a district court's determination of the facts for summary judgment purposes and determine those facts ourselves." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 n.5 (11th Cir. 2013) (citations omitted). We have determined the facts for ourselves, and we proceed to review the propriety of summary judgment *de novo*.

"the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[G]enuine disputes of facts are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (quotation marks omitted).

A city is liable under § 1983 when its "policy" or "custom" causes a constitutional violation.  *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*) (quotation marks omitted).  Landon claims that the City's systematic lack of training, supervision, and oversight of its K-9 officers caused the deprivation of his Fourth Amendment rights by Bush.  The district court found that Landon had not established an underlying constitutional violation, so it did not address whether the City's policy or custom caused Landon's injury.  We likewise limit our review to whether Landon has established that Bush used excessive force by commanding the police dog Tomy to bite him.

"Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard."  *Garczynski*, 573 F.3d at 1166.  This standard requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Scott v. Harris*, 550 U.S.

9

372, 383 (2007) (quotation marks omitted).  The government's interests include protecting the safety of the police officers involved, the public at large, and, where appropriate, the person seized.  *Garczynski*, 573 F.3d at 1166; *see Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (stating that a suicidal plaintiff "was a threat to himself, and Florida law recognizes a compelling interest in preventing suicide" (quotation marks omitted)).

The particular facts of each case must be analyzed to determine whether the force used was "objectively reasonable" under the totality of the circumstances. *See Graham*, 490 U.S. at 396–97.[4]  We must consider Bush's conduct "from the perspective of a reasonable officer on the scene," taking into account all of the attendant circumstances.  *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).  Those circumstances are often "tense, uncertain and rapidly evolving, thereby requiring split-second judgments as to how much force is necessary. Because an officer's perspective in the field differs from that of a judge sitting

---

[4] Landon presents his arguments under the framework of *Graham*, which directs courts, when evaluating the reasonableness of a use of force, to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  The district court analyzed the *Graham* factors as well, while noting that they did not directly apply in this case because it did not involve a criminal arrest.  *See also Mercado*, 407 F.3d at 1157 ("Because this situation does not involve a criminal arrest, our facts do not fit neatly within the *Graham* framework").  We do not attempt to fit our square facts through the round hole of *Graham*, because the reasonableness of a "use of a particular type of force in a particular situation" must be judged by the specific facts and circumstances confronting the officer.  *Scott v. Harris*, 550 U.S. 372, 382–83 (2007).  "All that matters" is whether, based on those facts, the officer's "actions were reasonable." *Id.* at 383.

10

peacefully in chambers, we must resist the temptation to judge an officer's actions with the 20/20 vision of hindsight." *Garczynski*, 573 F.3d at 1167.

Landon argues that Bush unreasonably deployed a police dog "to attack someone who was merely in need of help." Blue Br. at 31. He emphasizes that he was not suspected of any crime and that, when encountered by the officers, he was simply a depressed, suicidal person in his underwear who was lying on the ground bleeding and unconscious. He adds that he had no visible weapons, his only "resistance" was not obeying verbal commands and rolling *away* from the officers, and he made no attempt to flee. Because he was not a threat to the officers, Landon maintains, the "severe intrusion" of the dog bite was not justified.

With the benefit of hindsight, it would be easy to say that Landon could have been removed from the wooded area and taken to receive medical treatment without deploying Tomy or using any other significant force. And there is no question that it would clearly violate the Fourth Amendment for an officer to sic a police dog on a semi-conscious person who is not suspected of a crime and is not an immediate danger to the officer, others, or himself. But our task is not to evaluate what, with the benefit of hindsight, the officers could or should have done. "The sole inquiry is whether the officer's actions, as taken, were objectively reasonable under all the circumstances." *Garczynski*, 573 F.3d at 1167. And we

11

conclude that the particular type of force used in the specific circumstances confronting Officers Bush and Murges was objectively reasonable.

That Landon needed help was clear. The officers knew that he had attempted suicide, was bleeding profusely, and was intoxicated. That knowledge, in turn, meant they needed to act quickly to ensure that Landon received emergency medical care. Due to blood loss, any delay posed additional risks to Landon's health, and the officers had a "compelling interest" in preventing the attempted suicide from being completed. *See Mercado*, 407 F.3d at 1157.

But before the officers could take Landon to receive emergency medical care, they needed to get him under control, whether through voluntary compliance or involuntary force of some sort. Voluntary compliance was not an option because Landon did not comply with Bush's repeated requests to show his hands, and instead moved in such a way as to further conceal his hands. So that left approaching Landon and seizing him.

Based on what they knew at the time, the officers reasonably could have believed that Landon posed a threat to them if they approached. Landon was partially concealed in brush in a dark, wooded area. The officers knew that he might still be armed with a knife, he was suicidal and intoxicated, he had physically resisted Madish's attempts to take the first knife from him, and he had concealed his hands despite multiple commands to show them. Further, the

12

officers could reasonably have believed that Landon, notwithstanding the fact that he was lying on the ground bleeding, was still able to mount some resistance, given his recent flight to the wooded area and his apparent concealment of his hands in defiance of Bush's commands, despite warnings about the police dog. An officer in these circumstances—confronting in a dark, wooded area a suicidal, intoxicated, and non-compliant person who is potentially armed with a knife and had just recently fought with a family member—could reasonably have believed that approaching Landon and attempting to gain physical control over him would trigger an unpredictable and potentially violent response. The fact that officers were wearing body armor and carrying guns and other weapons does not, as Landon suggests, appreciably change the nature of that threat.

So while Landon did not pose any immediate threat to the officers when they were standing several feet away, it was reasonable to believe that Landon would pose such a threat if the officers approached and attempted to lay hands on him. As even Landon himself puts it, he was "a potential threat." Landon Br. at 42. Yet simply waiting for Landon's compliance or some clear indication that he was unconscious wasn't really an option, given his clear need for medical treatment. As we have established above, the officers had a compelling interest in ensuring that Landon received medical treatment as quickly as possible.

13

Faced with these circumstances, we think that Bush's limited use of non-lethal force—lasting no longer than necessary to ensure that Landon was not armed—was a reasonable response to an uncertain and potentially dangerous situation and the press of time.  The dog bite minimized the risk of harm to the officers and expedited Landon's removal from the wooded area.  As a result of the dog bite, the officers were able to see Landon's empty hands and then to approach and secure him so that he could be removed and transferred to receive medical treatment without posing any further danger to himself or others.[5]  Balancing the nature and quality of the Fourth Amendment intrusion—a significant[6] but brief use of non-lethal force—against the government's interests in saving Landon's life and

---

[5] In his reply brief, Landon highlights evidence that other officers who arrived after the dog bite could not see Landon's hands from where they were standing.  He reasons that if they could not see his hands after the dog bite, but still approached and pulled him out of the brush, then the dog bite was purely gratuitous.  However, our evaluation of the reasonableness of the dog bite focuses on the facts known to the officers at the time they acted.  For the reasons explained above, we conclude that Bush's decision to deploy Tomy was reasonable based on the facts confronting him.  Plus, the relevant circumstances had changed by the time officers pulled Landon from the brush.  By that time, Landon was no longer actively concealing his hands, from the perspective of Bush and Murges, and the officers had observed Landon's reaction to the dog bite, which suggested that he was not the threat he initially appeared to be.

[6] We recognize that the dog bite became infected and that the complications from that infection were extensive and severe.  However, Landon identifies no evidence from which a reasonable jury could conclude that Bush knew or reasonably should have known that deploying Tomy would result in an infection or that the infection would require surgery.  And "[w]e do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act." *Rodriguez v. Farrell*, 280 F.3d 1341, 1352–53 (11th Cir. 2002).  Therefore, we do not evaluate the severity of the act based on all of its resulting consequences. *Cf. id.* ("What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time.").

preventing harm to the officers, *see id.* at 383, we cannot conclude that Bush's actions were unreasonable under the circumstances.

While hindsight reveals that the officers could have secured Landon without using any significant force, "[w]e think the police need not have taken that chance and hoped for the best." *Scott*, 550 U.S. at 385. As for the viability of other non-lethal options, there was uncontradicted evidence that the use of a taser or pepper spray would have been ineffective given the brush covering Landon's body.

Landon maintains that summary judgment was inappropriate because only a jury is empowered to determine whether Bush's conduct was reasonable. "At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [the officer's] actions . . . is a pure question of law." *Scott*, 550 U.S. at 381 n.8 (citations omitted). Here, we must conclude that, even resolving all facts and reasonable inferences in favor of Landon, Bush's use of force was objectively reasonable as a matter of law.

As for the expert testimony, that does not change our conclusion. Landon says that the district court improperly ignored the expert opinions of Heyen and Zalisko. But he does not specifically explain how these opinions create a genuine issue of material fact. And we see no error in the district court's treatment of these expert opinions.

15

Finally, Landon cites evidence of Bush's text messages regarding other dog-bite incidents in an attempt to establish Bush's "propensity to use his police K-9 to bite persons who are the subject of police calls, regardless of the circumstance." But our inquiry turns on the objective reasonableness of the use of force, not any subjective beliefs or motivations of the specific officer involved. As the Supreme Court has stated, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." *Graham*, 490 U.S. at 397.

## V.

For these reasons, we affirm the district court's grant of summary judgment on Landon's § 1983 claims against the City arising out of the dog-bite incident on July 20, 2014.

**AFFIRMED.**

16