[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14781
Non-Argument Calendar
_____

D.C. Docket No. 0:17-cv-60255-CMA


JODI-KAYE SPARKES,
as personal representative of the Estate of
Marlon Woodstock,

                                        Plaintiff–Appellant,

versus

CITY OF SUNRISE,
GREGORY LOOR,

                                        Defendants–Appellees.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 1, 2019)

Before WILLIAM PRYOR, NEWSOM and BRANCH, Circuit Judges.

PER CURIAM:

Jodi-Kaye Sparkes, as personal representative for Marlon Woodstock's estate, appeals the summary judgment against her second amended complaint against the City of Sunrise, Florida, and Officer Gregory Loor of the Sunrise Police Department for excessive force in the fatal shooting of Woodstock. *See* 42 U.S.C. § 1983. Woodstock's family requested assistance in committing him involuntarily for a mental examination, Fla. Stat. § 394.463, but when officers confronted him, Woodstock refused to relinquish his knife, even after being shocked with tasers and bitten by a police canine. When Woodstock swiped his knife at him, Officer Loor shot Woodstock and then other officers disarmed him. The district court ruled that Officer Loor was entitled to qualified immunity. We affirm.

## I. BACKGROUND

The morning of September 30, 2014, Woodstock's roommate, Keith Daley, saw Woodstock talking to himself and spinning around in their back yard while holding multiple knives. Daley retreated to his bedroom and called a member of Woodstock's family. Woodstock's cousin, Leighton Buckley, drove to the house. Buckley tried to persuade Woodstock to put down the weapons, but Woodstock responded, "try me, try me," displayed his knives, chased Buckley down the street, returned to his house, and slashed the tires on Buckley's truck. Buckley called

2

Woodstock's brother, O'Neil Woodstock, for assistance, and O'Neil drove to Buckley's location. After Buckley got into O'Neil's vehicle, the two men followed Woodstock at a distance.

Around 11:00 a.m., O'Neil called 911 and reported Woodstock's behavior earlier that morning, including his hostility to Buckley. O'Neil stated that Woodstock was mentally ill, off his medications, extremely confrontational, known to be violent, and armed with a knife. O'Neil asked for Woodstock to be committed under the "Baker Act," *see* Fla. Stat. § 394.463, because he suffered from schizophrenia and other mental disorders and he was "in mental health court." After O'Neil stated that Woodstock was at the Mobil gas station on the corner of Sunset Strip and University Drive, officers were dispatched to take Woodstock into custody.

Officer M.D. Mosher of the Sunrise Police Department was first to the scene and spoke briefly with O'Neil about Woodstock. After backup officers arrived, Officer Mosher approached Woodstock and yelled, "Hey, Marlon," but Woodstock did not respond. After Officer Mosher repeated his greeting, Woodstock pulled out a large pocket knife from the waistband of his shorts and walked away. Officer Mosher broadcast over his radio that Woodstock had a knife and the dispatch operator repeated the officer's warning.

3

Officers activated their emergency sirens and followed Woodstock across traffic into the parking lot of a busy Walgreens store where a crew of landscapers was working. Detective Eric Bates blocked Woodstock's path with his patrol vehicle, but Woodstock ran into the passenger side of the vehicle, rolled off, and resumed running. Detective Bates abandoned his vehicle and chased Woodstock alongside Officer Luis Fernandez.

When Woodstock reached the lawn crew's truck, Officer Fernandez discharged his taser at Woodstock who then fell down. Detective Bates unholstered his taser and circled the truck to obstruct Woodstock's path as backup officers closed in. The group of officers repeatedly instructed Woodstock to drop his knife to no avail. As soon as the five-second shock from Officer Fernandez's taser ended, Woodstock stood up with his knife still clenched in his right hand. Detective Bates discharged his taser, and as Woodstock fell to his knees, Officer Loor ran to the scene with his police canine, Recon.

The parties dispute what happened next, but we must review the evidence in the light most favorable to Sparkes. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). One officer used his knee to pin Woodstock's head to his shoulder while another officer stepped on Woodstock's arm to immobilize his right hand in which he still clenched his knife. Woodstock continued to resist, which prevented officers from handcuffing his left arm. Officer Loor guided his police canine,

4

Recon, by his harness close enough to bite Woodstock's leg. Officer Loor and other officers instructed Woodstock to drop his weapon, but when he failed to comply, Detective Bates tased Woodstock. Officer Loor grabbed Woodstock's right hand, but Woodstock swung his knife at Officer Loor.

When Woodstock's arm touched Officer Loor's leg, he drew his service weapon and ordered Woodstock to drop his knife, but he ignored that order. Officer Loor then shot Woodstock in the chest. Woodstock glanced at his left shoulder and, without a sound, turned to face Officer Loor and continued to resist. Officer Loor shot Woodstock a second time, which caused Woodstock's torso to drop to the ground. Officer Loor then stepped on Woodstock's right forearm and called for assistance. Detective Eric Fernandez kneeled on Woodstock's right arm, while Major Louis Berman stomped on Woodstock's hand and pried the knife out of Woodstock's hand as a third officer handcuffed Woodstock.

## II. STANDARD OF REVIEW

We review *de novo* a summary judgment. *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1278 (11th Cir. 2017). Summary judgment is appropriate when there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We "resolve all issues of material fact in favor of the plaintiff" and "then answer the legal question of whether the defendant is entitled to qualified

5

immunity under that version of the facts." *Lee*, 284 F.3d at 1190 (internal quotation marks and citation omitted).

### III. DISCUSSION

Sparkes argues that a genuine dispute of material fact exists "whether the use of deadly force was reasonable and necessary" against Woodstock. Sparkes contends that Officer Loor "charged in without assessing [the] situation or determining if officers already on scene required K9 services" and "placed himself in a situation where one of his choices afterwards was to kill Mr. Woodstock." Sparkes also contends that the City is liable for Officer Loor's actions because he acted "in accordance with" its policies.

Qualified immunity shields government officials who are acting within their discretionary authority from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Nam Dang*, 871 F.3d at 1278 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If an official is acting within the scope of his discretionary authority when he or she committed the allegedly unlawful actions, the plaintiff must prove "that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. "We are required to grant qualified immunity to a defendant official unless the plaintiff can demonstrate two things: (1) that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if

so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015).  Because the parties agree that Officer Loor was acting within his discretionary authority when he shot Woodstock, this appeal turns on whether Officer Loor is entitled to qualified immunity. *See Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018).

Sparkes argues that Officer Loor's use of force against Woodstock was excessive. The Fourth Amendment right to be free from unreasonable searches and seizures "encompasses the right to be free from excessive force during the course of a" seizure. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). We evaluate an officer's use of force under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The officer's actions must be objectively reasonable in the light of the situation faced by the officer. *Id.* at 396. The force the officer employs "must be reasonably proportionate to the need for that force," as measured by, among other factors, the danger posed to officers on the scene. *Shaw*, 884 F.3d at 1099.

In the face of unfolding events, Officer Loor acted reasonably by using his police canine, Recon, to subdue Woodstock. The officers had been warned that Woodstock was mentally ill, confrontational and aggressive, armed with a knife, had discontinued his medications, and had acted unpredictably and violently that

morning. When greeted amicably by one officer, Woodstock fled wielding a knife. Woodstock ignored officers' orders to drop his weapon and refused to relent when shocked with tasers. Sparkes argues that "the Taser Deployments . . . [were] controlling" Woodstock, but the undisputed evidence establishes that Woodstock was still "actively resisting arrest," *Graham*, 490 U.S. at 396, while armed with his knife. We have approved of using a police canine when a person "up to that point, ha[s] shown anything but an intention of surrendering." *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009). Because officers were unable to secure Woodstock using other non-lethal methods, it was objectively reasonable for Officer Loor to deploy Recon.

Sparkes argues that Woodstock had yet to pose any actual threat to the police or the public so Officer Loor should have diffused the situation rather than use force, but "[o]ur task is not to evaluate what the officer[] could or should have done in hindsight," *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009). We evaluate "[t]he 'reasonableness "of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Woodstock had threatened to stab his cousin a few hours earlier and, in view of his repeated refusals to surrender or to relinquish his weapon, Officer Loor was not required "to wait 'and hope for the

8

best.'" *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 385 (2007)) (alteration adopted).

Officer Loor's later uses of deadly force were also objectively reasonable. "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act," *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007), but Officer Loor did so. Faced with a deranged and defiant man whom officers were unable to subdue or disarm, Officer Loor used deadly force when Woodstock threatened to stab him. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("[I]f the suspect threatens the officer with a weapon . . ., deadly force may be used . . . ."). When one bullet failed to incapacitate Woodstock, Officer Loor acted reasonably in using additional deadly force to overpower Woodstock so that officers could disarm and handcuff him.

Officer Loor was entitled to qualified immunity. His use of a police canine and deadly force was objectively reasonable in this circumstance and did not violate Woodstock's right to be free from excessive force. The district court correctly entered summary judgment in favor of Officer Loor and against Sparkes's claim of excessive force.

Sparkes's claim against the City also fails as a matter of law. "Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise." *Vineyard v. Cty. of Murray, Ga.*, 990 F.2d

1207, 1211 (11th Cir. 1993). Officer Loor did not commit a constitutional violation, which means that the City has no municipal liability. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

## IV. CONCLUSION

We affirm the summary judgment in favor of Officer Loor and the City of Sunrise.