[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 11-10803

————————————————

D. C. Docket No. 1:08-cv-01778-MHS

SYDNEY CARSON OAKES,
a minor through her parent and natural guardian,
Debra Nelkin Oakes,
DYLAN NICOLE OAKES,
a minor through her parent and natural guardian,
Debra Nelkin Oakes,
et al.,

Plaintiffs-Appellants,

versus

SERGEANT K. L. ANDERSON,
of DeKalb County Police Department,
individually,
OFFICE L. DANIELS,
of DeKalb County Police Department,
individually,
et al.,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(October 23, 2012)

Before DUBINA, Chief Judge, and CARNES and ANDERSON, Circuit Judges.

PER CURIAM:

Carter Oakes's surviving children and his Estate (together, "Plaintiffs"), appeal the grant of summary judgment in favor of three DeKalb County police officers and DeKalb County, Georgia. Plaintiffs' suit claimed damages under 42 U.S.C. § 1983 and for the wrongful death of Oakes, who was shot and killed by Sgt. K.L. Anderson in May 2006. After careful consideration of the record and briefs, we affirm.

Many of the facts are not controverted. Officer Daniels was dispatched to a shopping center after a 911 call was received, indicating possible trouble between some people in the parking lot. When Daniels arrived at the parking lot, Oakes's girlfriend Karen Maxwell was present, as was Ben Wheeler, whom Maxwell had called to help her with Oakes. Maxwell told Daniels that Oakes had been drinking for three days and had threatened suicide. Oakes had told Maxwell that he wanted to kill himself but could not pull the trigger because he was a "coward."

Maxwell showed Daniels a gun case that she had taken out of Oakes's vehicle, but when Daniels opened the case, he found it to be empty. Daniels, Maxwell, and Wheeler believed that Oakes likely had the gun somewhere in the car.

2

Oakes was leaning against the car when Daniels first arrived but then moved to the driver's seat of the car, with his legs hanging outside the open door. When Daniels arrived, Oakes became more agitated.[1] The officer offered to take Oakes anywhere he wanted to go to get help. Daniels, concerned that Oakes had access to a gun in his car, repeatedly asked in a calm voice for Oakes to leave the vehicle. Oakes refused. He had committed no crime; Daniels was attempting to help Oakes because of Oakes's emotional state. He was not under arrest.

Officer Wernecke then arrived at the parking lot as back-up for Daniels. Daniels's efforts to get Oakes to leave his car had yielded no progress. Now both officers talked to Oakes. Around this time, he put his legs inside the car and continued to sit in the driver's seat. He refused to let the officers search his vehicle and continued to refuse to leave the vehicle. The officers were concerned about Oakes's access to a gun in his car, and Oakes became increasingly agitated.

About fifteen minutes after he had first arrived at the scene, Daniels radioed for a supervisor because Daniels felt that he and Wernecke were at an impasse with Oakes. Sgt. Anderson arrived; he was told that Oakes likely had access to a gun, was depressed and suicidal.

---

[1] Maxwell testified that when Daniels first arrived, Oakes told her, "You better get him [Daniels] out of here or I'll make them shoot me."

3

Anderson approached Oakes and asked if the officers could get him help. He also asked Oakes whether he was on medication. Oakes said that he was prescribed depression medication but was not taking it. Anderson repeatedly asked Oakes if he had a weapon. Oakes said he did not have a weapon. When the officers asked again, Oakes would not answer directly, only saying, "What do you mean by a 'weapon'"?

Anderson was concerned that Oakes was sitting on the gun and asked Oakes if he would sit up so the officers could check. Oakes moved very slightly, but the officers could not see whether a gun was in the seat. Anderson repeatedly asked Oakes to step out of the car, just so the officers could ensure there was no weapon.

About this time, Wernecke activated an audio recording device that he was wearing. Parts of the recording are difficult to understand due to background noise, but Anderson can clearly be heard saying that he is asking Oakes one last time to step out of the car or the officers would have to take him out of the car.

Oakes still refused and stated that the officers "better unsnap."[2] Oakes can be heard on the recording saying, "I ain't going down this way." Anderson again

---

[2]    Some witnesses described the comment as "go ahead and unbuckle" or "might as well unsnap."

4

told Oakes to "stand down" so the officers could search the car for safety's sake, to ensure there was no weapon.  Oakes again refused to comply.

Anderson, who was standing inside the open driver's door, reached for Oakes's right arm while Daniels reached for Oakes's left arm.  Oakes flailed his hands and repelled the officers' hands.

Wheeler, who was now standing on the passenger side of the car, said that Oakes turned and pointed at him with his index and middle fingers.  Oakes then reached into the area between the driver's seat and the center console.[3]

Oakes's right hand was not within the officers' view.  Fearful that Oakes was reaching for his gun, Anderson shouted "gun, gun, gun" to alert the other officers.  Anderson did not actually see any gun.  He quickly moved to the outside of the open driver's side door and drew his weapon.  Daniels and Wernecke also drew their weapons.

For about thirty seconds, the officers can be heard on the audio recording repeatedly shouting "show your hands!," "hands up!," "one more time, sir hands up!," and "let me see your hands now!"  Anderson said he could see Oakes

---

[3]    Anderson stated that Oakes pushed the officers' hands away and then immediately reached into the hole between the seat and the console.  However, Maxwell stated that Oakes turned and looked at the location where Maxwell and Wheeler were standing, just before he was shot.

5

wiggling his right arm, as if his hand was searching for something between the seat and console.

At that point, Anderson saw Oakes jerk his right hand out of the space between the seat and the console and start to move his arm across his body. From this movement, Anderson thought Oakes had grabbed a gun and was pulling it out. Believing Oakes was "fixing to fire," Anderson shot twice and fatally wounded Oakes. Anderson had not actually seen a gun.

Daniels, who had been standing behind Oakes and to the left, said he saw Oakes's shoulders move up and his hands come up, "like he was trying to pull something out." Wernecke, who had been standing at Oakes's left profile, said he saw Oakes's right arm "kind of go up in a jerking motion," but he had not seen the hand actually come out of the hole or move across Oakes's body. None of the officers had seen a gun.

No gun was in Oakes's hand, but a loaded gun was later found between the driver's seat and the center console in the very area that Oakes had reached; Oakes had access to the gun while he was refusing the commands to show his hand.

The district court concluded that the officers' actions were objectively reasonable, and therefore there was no constitutional violation and the officers were protected by qualified immunity. We agree.

6

As the district court noted, excessive force claims are to be analyzed under the "objective reasonableness" standard set out in Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989). Under Graham, the reasonableness of the force used to effect a seizure "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396, 109 S. Ct. at 1871 (internal quotations omitted). And "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397, 109 S. Ct. at 1872.

Graham counsels that the totality of the circumstances must be reviewed; the test of reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S. Ct. at 1872.[4]

---

[4]    Maxwell testified that she had taken Oakes's car keys before Daniels had arrived, but Oakes had taken them back from her and put them in his pocket. However, she was uncertain about whether he still had the keys when the officers were trying to get him to leave the

7

The facts before us, viewed in the light most favorable to Plaintiffs, establish that the officers were addressing an emotionally distraught man who had threatened suicide and who likely had a gun in his vehicle. Oakes repeatedly had refused the officers' request that he step outside of his vehicle; he would not allow the officers to search his vehicle for a gun. When the officers told him that they would have to remove him from the car, Oakes told the officers that they "better unsnap" because he "ain't going down this way."

After the officers unsuccessfully tried to remove Oakes from the car, he placed his hand between the driver's seat and the center console. At that point, Oakes's hand was hidden from the officers' view. For almost thirty seconds, the officers shouted for Oakes to show his hands, but he ignored their repeated commands. When Oakes then made a sudden jerking movement with his right arm, Anderson fired.[5]

---

vehicle.

[5]     Plaintiffs argue that conflicts in the testimony of the three officers raise a material issue of disputed fact that should have precluded summary judgment. We disagree. As the district court set out, even though some minor conflict in the evidence may exist about whether Oakes's hand came out from between the front seat and the center console before he was shot, all three officers observed a sudden movement by Oakes as if he were pulling something (which they reasonably suspected was a gun) out of the hole. The officers were in different positions around the open driver's door, and their observations were consistent with their line of sight into the vehicle.

Given that Oakes likely had a gun in the vehicle and was reaching with his hand into a

8

Because the officers were not attempting to arrest Oakes and no crime had been committed, the facts before us do not fit neatly within the Graham framework. See Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005) (examining an excessive force claim in the context of a threatened suicide).

However, under these circumstances, we agree with the district court that it was reasonable for Anderson to fire upon Oakes in defense of himself, his fellow officers, and bystanders. See Carr v. Tatangelo, 338 F.3d 1259, 1264, 1275 (11th Cir. 2003) (granting qualified immunity where officers shot at men whom the officers reasonably believed had cocked a gun and were aiming it at another officer, even though the men actually had no gun).

The "reasonableness" standard makes allowance for the fact that an officer on the scene is "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 397, 109 S. Ct. at 1872. The situation here escalated rapidly. In a span of only five seconds,

---

common place for guns to be hidden, this sudden movement—after Oakes had ignored the officer's commands for almost thirty seconds—was sufficient to create a reasonable fear that Oakes was pulling out a gun and could fire in a split second.

Ten other witnesses testified about what they saw. Most of them were watching the scene from across the parking lot, with vehicles blocking their view of Oakes. Only a few were in a position where they possibly could have seen Oakes make a sudden arm motion, and none of them were able to testify with respect thereto, either because they were not looking at the precise moment, or because from their location and distance and in light of the obstacles to their view, they could not reasonably have been expected to see the sudden arm motion.

9

Oakes went from merely being stubborn, to fighting off the officers and reaching his hand into an area where he could have had a loaded gun. For thirty seconds after the officers drew their weapons, he completely ignored repeated demands to show his hands, then jerked his arm suddenly. This is "exactly the type of tense, uncertain and rapidly evolving crisis envisioned by the Supreme Court" when officers "reasonably react[] to what they perceive[] as an immediate threat of serious harm to themselves." Garczynski v. Bradshaw, 573 F.3d 1158, 1168 (11th Cir. 2009) (internal quotations omitted).

Plaintiffs suggest that the officers made several tactical mistakes that escalated the situation and ultimately resulted in Oakes's death. Plaintiffs claim, inter alia, that the officers should have distanced themselves from Oakes and never should have tried to grab him from the car. "Our task is not to evaluate what the officers could or should have done in hindsight. The sole inquiry is whether the officer's actions, as taken, were objectively reasonable under all the circumstances." Id. at 1167. "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." Menuel v. City of Atlanta, 25 F.3d 990, 997 (11th Cir. 1994) (quoting Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)).

10

Having examined the record in this case, we do not see any unreasonable actions taken by the officers. We disagree with Plaintiff's contention that it was unreasonable for the officers not to leave Oakes alone in the shopping center parking lot. He had proven himself uncooperative and likely had a weapon. And to counter the risk posed by Oakes, it was both reasonable and appropriate for the officers to ask to search the car and ultimately to remove Oakes from the car to determine whether he had access to a gun. See Michigan v. Long, 463 U.S. 1032, 1047, 103 S. Ct. 3469, 3479 (1983) (holding that, in the context of a Terry stop, "[w]hen the officer has a reasonable belief that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm") (internal quotations omitted). As for Plaintiffs' claim that the officers should have used pepper spray rather than a firearm, there "is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used." Menuel, 25 F.3d at 996 (quoting Plakas, 19 F.3d at 1148). We similarly conclude that it was objectively reasonable for Anderson to yell "gun, gun, gun"

11

as a quick warning to the other officers that Oakes's hands had disappeared into the hole between the seat and console.

Plaintiffs contend that perhaps Oakes was just complying with the officers' orders to show his hands. But there was a good chance that Oakes was pulling his gun out of the hole and could fire upon the officers in a split second. In a life-or-death situation like this, we think that Anderson "need not have taken that chance and hoped for the best." Scott v. Harris, 550 U.S. 372, 385, 127 S. Ct. 1769, 1778 (2007).[6]

Plaintiffs contend that the officers' attempt to remove Oakes physically from his car was reckless. According to Plaintiffs' argument, it was this reckless act, together with their repeated shouting to Oakes to show his hand, that provoked the confrontation and caused the need for the use of deadly force. Plaintiffs rely on the hindsight testimony of their expert witnesses. This Court, in Garczynski, rejected a similar argument, noting that our "task is not to evaluate what the officers could or should done in hindsight." 573 F.3d at 1167. The acts

---

[6]    We need not spend time addressing all of Plaintiffs' suggestions about actions that the officers could have taken differently. These claims of unreasonableness are made with "the 20/20 vision of hindsight," rather than from "the perspective of a reasonable police officer on the scene." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.

about which Plaintiffs complain were objectively reasonable under the circumstances and under our precedent.

The events of that day were undoubtedly tragic. One life ended, and many other lives will never be the same. However, the evidence, viewed in the light most favorable to Plaintiffs, shows that the officers acted in an objectively reasonable manner, given the threat that Oakes posed. No excessive force has been shown. The district court correctly granted summary judgment to the officers.[7] Absent a constitutional violation, Plaintiffs' claims against DeKalb County are without merit.

AFFIRMED.[8]

---

[7]    For the same reasons, Plaintiffs' state-law claims must also fail. See Kidd v. Coates, 518 S.E.2d 124, 125-26 (Ga. 1999).

[8]    This appeal was originally scheduled for oral argument but was removed from the oral argument docket under 11th Cir. Rule 34-3(f).