[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10601
_____

D.C. Docket Nos. 0:11-cv-61398-KAM ; 0:06-13274-JKO

IN RE:  NEW RIVER DRY DOCK, INC.,

Debtor.
_____

CHRISTOPHER "KIT" DENISON,
MARINE REALTY, INC.,

Plaintiffs-Appellants,

versus

MARINA MILE SHIPYARD, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(November 16, 2012)

Before HULL and BLACK, Circuit Judges, and WHITTEMORE,[*] District Judge.

PER CURIAM:

Christopher ("Kit") Denison and his company, Marine Realty, Inc., (collectively "Realtors")[1] appeal the district court's affirmance of the bankruptcy court's grant of summary judgment in favor of Marina Mile Shipyard, Inc. ("MMS"), one of the creditors of the bankruptcy estate. The Realtors challenge the bankruptcy court's order to disgorge $490,000 in commissions that they received after brokering the sale of the debtor's marina property. After review, we affirm.

## I. BACKGROUND FACTS

### A.    The Realtors' Role in the Bankruptcy Proceedings

In 2006, the debtor, whose primary asset was a marina, filed a petition for Chapter 11 bankruptcy. The debtor decided to hire the Realtors as a real estate agent to sell the marina, and submitted an application to the bankruptcy court for the approval of the Realtors' employment. As part of the application, Denison (one of the Realtors) submitted an unsworn declaration, in which he attested that

---

[*]Honorable James D. Whittemore, United States District Judge, Middle District of Florida, sitting by designation.

[1]Denison contends that his wife owns Marine Realty and that he worked for the company as an employee.

neither he nor Marine Realty held or represented an interest adverse to the debtor, and that both were "disinterested persons" within the meaning of 11 U.S.C. § 101(14). For their services, the Realtors were to receive a commission equal to 4% of the gross sale price. In October 2006, the bankruptcy court approved the application for the Realtors' employment and the proposed commission.

As part of his efforts to sell the marina, Denison contacted Steve Israel, an investor with whom Denison had a prior business relationship, and suggested that Israel submit a "stalking horse" bid on the property.[2] Israel eventually agreed to submit a stalking horse bid of $12.25 million, far below the marina's officially appraised value, and partnered with another investor, Fred Scott, to provide most of the funds to purchase the marina. There were no higher bids, and Denison ultimately acted as a broker in the court-approved sale of the marina for $12.25 million to SPVEF-SKID, LLC, a joint venture company formed by Scott and Israel for the purchase of the marina. The sale closed in June 2007.

Sometime after the bankruptcy court's approval of the Realtors' employment, but before the closing, Scott and Israel offered Denison the opportunity to manage the marina after the closing, or to acquire an ownership

---

[2] A "stalking horse" bid is the first bid from a potential buyer on a bankrupt debtor's assets. The debtor solicits this bid to set the floor for the later competing bids of other potential purchasers, thereby preventing lowball offers.

interest in the marina.  Denison never refused the buyers' offers to be involved in managing or owning the marina, and the buyers expected that Denison would be involved after the closing.  Additionally, Denison performed numerous tasks on the buyers' behalf before the closing, such as preparing capital expenditure schedules, obtaining insurance on the marina, and meeting with prospective contractors and tenants.  Shortly after closing, Scott sent an e-mail to Denison, Israel, and Israel's attorney, stating, in part: "I want to personally thank you all for getting to the point we are at today.  A lot of hard work by all got us ownership of a valuable asset at a below market price . . . ."  Two or three months later, Denison formalized an agreement to manage the marina and bought an ownership interest in it.

At no point prior to the closing did the Realtors disclose to the bankruptcy court Denison's discussions with the buyers about his intended post-closing involvement with the buyers and the marina.  The Realtors also failed to disclose to the bankruptcy court that Denison paid $37,500 from his commission on the sale to cover half of a "finder's fee" owed by the buyers to a third party.  And Denison never disclosed to the court that he had a business relationship with one of the buyers prior to being employed by the debtor.  Furthermore, under their contract with the debtor, the Realtors were to receive a four percent commission

4

amounting to $490,000. However, the Realtors actually received a $535,000 payment, and admit that they were overpaid by $45,000.

After the sale of the marina, the bankruptcy court confirmed the debtor's reorganization plan, which included a release by the debtor and creditors of claims against professionals arising out of the bankruptcy case.

Two years later, Marina Mile Shipyard, Inc. ("MMS"), the largest unsecured creditor of the debtor, alerted the bankruptcy court about Denison's relationship with the buyers of the marina, Israel and Scott. The bankruptcy court sua sponte ordered the Realtors to show cause why they should not disgorge their commission fee. MMS also filed a separate motion seeking the disgorgement of the Realtors' commission fees. A lengthy litigation ensued between the Realtors and MMS over the commission fees, and both parties filed motions for summary judgment on the issue of disgorgement. The bankruptcy court ultimately entered two orders that are at issue in this appeal.

First, the bankruptcy court ordered the  Realtors to repay, in installments, the $45,000 (with interest) that the Realtors received in excess of their authorized commission on the sale of the marina. Although the Realtors never objected to this order, and do not challenge it on appeal, they failed to comply with that order and repay the $45,000 to the bankruptcy plan administrator. MMS then filed an

5

emergency motion to sequester $25,981.41 of commissions that Marine Realty received from an unrelated real estate transaction.  The bankruptcy court granted MMS's motion and ordered the sequestration of the Realtors' commission funds.  Denison filed a notice of exemption from garnishment under Fla. Stat. § 222.12 and requested a hearing on the matter.  The bankruptcy court, however, ultimately struck Denison's notice of exemption and request for a hearing.

The second court order at issue in this appeal is the bankruptcy court's grant of MMS's motion for summary judgment on the issue of disgorgement.  In that order, the bankruptcy court concluded that Denison had an interest adverse to the estate while employed by the estate, in light of Denison's undisclosed pre-closing relationship with the buyers.  The bankruptcy court ordered the Realtors to disgorge their $490,000 commission.

The Realtors appealed to the district court, and the district court affirmed the bankruptcy court's grant of summary judgment to MMS.  The Realtors now appeal.

## II. DISCUSSION

We have jurisdiction under 28 U.S.C. § 158(d).  Because the district court affirmed the bankruptcy court, we review the bankruptcy court's decision.  Educ. Credit Mgmt. Corp. v. Mosley (In re Mosley), 494 F.3d 1320, 1324 (11th Cir.

2007).  We review the bankruptcy court's legal conclusions de novo and its factual findings for clear error.  Id.

## A.    Standing

Denison contends that MMS (the creditor) lacked standing to request a disgorgement of fees because MMS had no authority to recover property of the bankruptcy estate and the Plan Administrator did not have authorization to assign this claim to MMS.  This argument is meritless.

A bankruptcy court may, on its own motion or on a motion from any "party in interest," reduce a fee award.  11 U.S.C. § 330(a)(2).  As the underlying debtor's largest unsecured creditor, MMS was a party in interest in the bankruptcy case.  See 11 U.S.C. § 1109(b) (defining a "party in interest" to include creditors).  Therefore, MMS had standing to ask the bankruptcy court to order the disgorgement of the fees paid to Denison from the bankruptcy estate.[3]  See id. (stating that a creditor "may raise and may appear and be heard on any issue" in a Chapter 11 case).

## B.    Release of Liability

---

[3] Even if we were to assume that MMS lacks standing, the bankruptcy court could have ordered the same relief sua sponte.  See 11 U.S.C. § 330(a)(2).  In fact, the bankruptcy court's show cause order was entered sua sponte.

Denison contends that the bankruptcy court erred in ordering a disgorgement of fees because the Chapter 11 plan released all claims against professionals arising from the bankruptcy case.  We disagree.

A trustee administering the bankruptcy estate may employ professionals such as real estate brokers, subject to the bankruptcy court's approval.  See 11 U.S.C. § 327.  Before a professional can be paid, a bankruptcy court must review and approve the fees to be paid.  See 11 U.S.C. § 330(a); see also In re Marin, 256 B.R. 503, 507 (Bankr. D. Colo. 2000).  A bankruptcy court may deny fees to a professional, "if, at any time during such professional person's employment under section 327 . . . of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."  11 U.S.C. § 328(c); see Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince), 40 F.3d 356, 360 (11th Cir. 1994).  A bankruptcy court retains jurisdiction over an award of fees even after the conclusion of the bankruptcy case.  See Dery v. Cumberland Cas. & Surety Co. (In re 5900 Assocs., Inc.), 468 F.3d 326, 330–31 (6th Cir. 2006).

Here, it is undisputed that Denison was a professional employed by the debtor under 11 U.S.C. § 327.  The plan's release of liability against professionals

8

did not affect the bankruptcy court's authority over the fees paid to those professionals. See 11 U.S.C. §§ 328(c), 330(a)(2). The bankruptcy court initially reviewed and approved Denison's fee without knowledge that he had an interest adverse to the estate. Once the court learned this fact, it had the authority to revisit Denison's fee award. See id.

## C.    Summary Judgment

Denison argues that the bankruptcy court erred in granting summary judgment to MMS because the court's findings of fact were not supported by the evidence. In essence, he contends that there was no evidence of an improper relationship between him and the buyers during his employment as a real estate agent for the debtor.

In ruling on a motion for summary judgment, the bankruptcy court is required to view the facts and draw all inferences in favor of the nonmoving party. See Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56 in adversary proceedings); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009). Summary judgement is appropriate if there is no genuine dispute about a material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

9

Here, the material fact is whether Denison held an interest adverse to the estate while employed by the estate. See 11 U.S.C. §§ 327 & 328(c). We have said that a professional has an interest adverse to the estate when he:

> possess[es], or serv[es] as an attorney for a person possessing, either an economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant . . . or . . . a predisposition under the circumstances that render such a bias against the estate.

Electro-Wire Prods., Inc., 40 F.3d at 361 (quoting Roger J. Au & Son, Inc. v. Aetna Ins. Co., 64 B.R. 600, 604 (N.D. Ohio 1986) (internal quotation marks omitted)).

The undisputed evidence shows that, prior to closing, Denison discussed, and had an expectation of, being involved with the buyers and the marina after the closing. Both Scott and Israel (the buyers) testified in their depositions that they discussed with Denison his prospective post-closing involvement with the marina while he was still working for the estate. Specifically, the buyers discussed with Denison the possibility of him either managing the marina post-closing, taking an ownership interest in the marina, or both. E-mails between Scott, Israel, and Denison confirm that these discussions took place. The emails also indicate that Denison was working on the buyers' behalf before the closing.

10

The discussions about post-closing employment or ownership of the marina gave Denison a reason to close the sale even if it was not in the estate's best interest. There is no genuine issue of fact on this point. In fact, the record only confirms that Denison was determined to see this particular sale go through. It is undisputed that Denison paid $37,500 for the buyers' benefit out of his commission from the closing. And Denison has admitted that he paid this money to keep the buyers from walking away from the sale.

Denison contends that he had no formal agreement or understanding with the buyers until after the closing. This fact is not material in this context. While Denison may not have formalized his relationship with the buyers until after the closing, he discussed working for them and had a strong expectation that he would work for them. That strong expectation was enough to give him an interest adverse to the estate, and he should have disclosed that interest to the bankruptcy court.

We acknowledge that the estate may not have suffered any actual financial loss because of Denison's relationship with the buyers, and Denison may not have intended to enrich himself at the expense of the estate. However, the issue is not whether Denison caused any actual harm, but whether he "could have unbiasedly made decisions in the best interest" of the estate. See Electro-Wire Prods., Inc., 40

11

F.3d at 360. Denison's pre-closing discussions regarding his post-closing involvement with the marina rendered him unable to make impartial decisions on behalf of the estate, even if "fraud or unfairness [was] not shown to have resulted." See id. (quoting Woods v. City Nat'l Bank & Trust Co. of Chicago, 312 U.S. 262, 268, 61 S. Ct. 493, 497 (1941)). In this light, the bankruptcy court did not err in granting MMS summary judgment on the ground that Denison acted under a conflict of interest during his employment.

**D.    Sequestration**

Denison argues that the bankruptcy court acted ultra vires when it sequestered $25,981.41 of Marine Realty's money. We reject this contention. Denison agreed to repay the estate $45,000 plus interest, and the bankruptcy court entered a judgment against Denison for that amount. Denison does not contest that judgment on appeal, but only the court's actions in sequestering the money to satisfy the outstanding balance of the judgment.

The bankruptcy court had authority under 11 U.S.C. § 105(a) to sequester these funds to ensure compliance with its order and judgment to return the $45,000 commission overpayment. See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

12

Denison also contends the bankruptcy court erred in denying his head-of-household exemption under Fla. Stat. § 222.12 for the $25,981.41. This argument fails. Florida law does not exempt from garnishment the proceeds of a business, even a sole proprietorship, where the owner of that business does not pay himself a set wage or salary. See Vining v. Segal, 731 So. 2d 826, 827 (Fla. 3d DCA 1999) (holding that the accounts of a dental practice, a sole proprietorship, were not exempt from garnishment because the proprietor did not pay himself a wage or salary from those accounts, which held the proceeds of the dental practice, but used the accounts to pay both business and personal expenses); see also Vining v. Martyn, 858 So. 2d 365, 366 (Fla. 3d DCA 2003) (holding that the proceeds of a garnishee's law practice were not exempt from garnishment under § 222.12).

In this case, at the hearing concerning exemption, the bankruptcy court found that the sequestered funds, when seized, belonged to Marine Realty—not Denison. This finding was not clearly erroneous, as Denison admitted that the funds, which consisted of a commission on an unrelated real estate transaction, did not come from Denison's bank account, but Marine Realty's account. Thus, those funds were not exempt from garnishment under Florida law. See Vining, 731 So. 2d at 827.

**AFFIRMED.**

13